UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ERIC BUTLER and JACOB J.
KATZBURG,

                              Plaintiffs,

          – against –

CITY OF NEW YORK; BILL DE
BLASIO, *in his personal and official
capacity as the Mayor of New York City*;
DERMOT SHEA, *in his personal and
official capacity as Police Commissioner of
the New York City Police Department*; and
POLICE OFFICERS "JOHN"
RODRIGUEZ (TAX:  952174), "JOHN"
VILLANUEVA (BADGE NUMBER
27398), "JOHN" LARKENS (BADGE
NUMBER 13260), NICHOLAS T.
BRUCCOLERI (TAX:  960288), "JOHN"
MEJIA, JOHN DOES 1-15, SERGEANTS
"JOHN DOE" 1-5, and CAPTAIN "JOHN
DOE," *all in their personal and official
capacity*,

                              Defendants.

**OPINION & ORDER**

20 Civ. 4067 (ER)

R<small>AMOS</small>, D.J.:

Eric Butler and Jacob J. Katzburg brought this suit pursuant to 42 U.S.C. § 1983, alleging that their constitutional rights were violated when they were arrested at a protest against the policies New York City Mayor Bill de Blasio implemented in response to the COVID-19 pandemic.  Doc. 1.  More specifically, Plaintiffs were arrested for violating an executive order that banned all "non-essential gatherings," and allege that the executive order was unconstitutional.  *Id.*  Pending before the Court is Defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(b)(7).  Doc. 38.

For the following reasons, Defendants' motion to dismiss is GRANTED.

I.      BACKGROUND

A. Factual Background

Now almost eighteen months since the World Health Organization characterized COVID-19 as a pandemic, and in the midst of a fourth surge in the United States, the seriousness, pervasiveness, and evolving nature of the COVID-19 pandemic is well documented.  This case does, however, require the Court to recount the precautions taken by government officials at the beginning of the pandemic.

On March 7, 2020, then-Governor Andrew Cuomo declared a state of emergency due to the threat posed by COVID-19, N.Y. Exec. Order No. 202, https://www.governor.ny.gov/sites/default/files/atoms/files/EO_202.pdf, and on March 12, 2020, Mayor de Blasio declared a state of emergency in New York City, Doc. 1. ¶ 22. As the victim count climbed in the city and across the state, the Governor and the Mayor implemented a number of executive orders to combat the rise in infections.  *See id.* ¶¶ 23–25.

Relevant here are two of the Governor's orders.  First, on March 18, 2020, the Governor issued Executive Order 202.6, which imposed in-person capacity restrictions, but exempted from those restrictions "[a]ny essential business or entity providing essential services or functions."  Doc. 1-6.  Under that order, an "essential business or entity providing essential services or functions" is defined as:

> essential health care operations including research and laboratory services; essential infrastructure including utilities, telecommunication, airports and transportation infrastructure; essential manufacturing, including food processing and pharmaceuticals; essential retail including grocery stores and pharmacies; essential services including trash collection, mail, and shipping services; news media; banks and related financial institutions; providers of basic necessities to economically disadvantaged populations; construction; vendors of essential services necessary to maintain the safety, sanitation and essential operations of residences or other essential businesses; vendors that provide essential services or products, including logistics

> and technology support, child care and services needed to
> ensure the continuing operation of government agencies and
> provide for the health, safety and welfare of the public.

*Id.*  Second, on March 23, 2020, the Governor issued Executive Order 202.10, which, among other things, declared that all non-essential gatherings of individuals of any size for any reason were cancelled or postponed.  N.Y. Exec. Order No. 202.10, https://www.governor.ny.gov/sites/default/files/atoms/files/EO_202.10.pdf.

The executive order directly at issue in this suit, however, is the Mayor's Emergency Executive Order 103 ("EEO 103"), which was propounded on March 25, 2020.  *Id.* ¶ 27.  EEO 103 states:  "In order to avoid the mass congregation of people in public places and to reduce the opportunity for the spread of COVID-19 any non-essential gathering of individuals of any size for any reason shall be cancelled or postponed."  Doc. 1-5 § 3(b).  EEO 103 also incorporates any and all relevant provisions of the Governor's emergency orders, including Executive Order 202.6.  *Id.* §§ 2(c), 4. Regarding Executive Order 202.6 specifically, EEO 103 states:

> Any essential business or entity providing essential services
> or functions, as defined by [the Governor's] Executive Order
> 202.6 and guidance issued by the Empire State Development
> Corporation or designated as essential pursuant to any
> subsequent order issued by the Governor, shall not be subject
> to the in-person restrictions.

*Id.* § 2(c).  The Mayor extended the ban on non-essential gatherings several times, and the ban was still in effect on May 9, 2020.  *See* Doc. 1 ¶¶ 30–38.

That day, at approximately 1:00 p.m., Plaintiffs—both residents of New York— gathered with approximately twenty other people in City Hall Park in New York City to protest the executive orders the Mayor had issued in response to the COVID-19 pandemic.  *Id.* ¶¶ 8–9, 46–52.  According to Plaintiffs, the protestors attempted to maintain a distance of six feet between themselves at all times, and several wore face

coverings.  *Id.* ¶¶ 51–52.  Plaintiffs also allege that, while the group was protesting, there were other park-goers nearby, though they were not associated with each other.  *Id.* ¶ 53.

At approximately 1:35 p.m., the Police Defendants—that is, all Defendants except for the City of New York (the "City"), the Mayor, and Dermot Shea, the police commissioner of the New York City Police Department ("NYPD")—assembled outside of the park.  *Id.* ¶¶ 58–59.  The Police Defendants include "John" Rodriguez, "John" Villanueva, "John" Larkens, Nicholas T. Bruccoleri, "John" Mejia, and several other unnamed members of the NYPD.

After standing outside the park for several minutes, the Police Defendants then entered, forming a line that blocked off one of the entrances to the park.  *Id.* ¶ 59.  Once inside, the officers played an audio recording over a loudspeaker stating:  "This is the New York City Police Department.  Non-essential gatherings of any kind have been prohibited by the Governor and the Mayor.  This gathering is unlawful, and you are ordered to disperse.  If you fail to disperse immediately, you are subject to arrest."  *Id.*

After playing the recording for five minutes, the Police Defendants approached Plaintiffs and the other protestors.  *Id.* ¶ 61.  Rodriguez ordered Katzburg to leave the park, to which Katzburg objected that the park was open to the public and that he was exercising his First Amendment right to freedom of assembly.  *Id.* ¶¶ 62–63.  Rodriguez, Villanueva, and Larkens then arrested Katzburg, after Defendant Sergeant John Doe 1 instructed them to do so.  *Id.* ¶¶ 64–65.  Meanwhile, the other Police Defendants continued to escort the other protestors out of the park.  *Id.* ¶ 67.  As Butler walked away from the park, Bruccoleri and Mejia arrested him.  *Id.* ¶¶ 69–70.  In total, nine protestors—including Plaintiffs—were arrested.  *Id.* ¶ 72.

Plaintiffs were then taken by van to the NYPD's Seventh Precinct and were released from custody later that day, each with a criminal summons.  *Id.* ¶ 74.  Butler's summons stated that he was charged with "Violat[ing] The Mayor's Order" under New York City Administrative Code § 3-108.  *Id.* ¶ 75; *see also* Doc. 1-19.  Katzburg's

summons stated that he was charged with that same offense and with "Discon:  Failure to Disperse," pursuant to New York Penal Law § 240.20(6).  Doc. 1 ¶ 76; *see also* Doc. 1-20.

The Mayor extended the ban on all non-essential gatherings twice more, Doc. 1 ¶¶ 39–40, but on May 24, 2020, he modified the ban to permit non-essential gatherings of ten or fewer individuals, so long as those individuals adhered to applicable social distancing and cleaning protocols.  *Id.* ¶ 41; *see also* Doc. 1-18 § 2.  The capacity limits were incrementally increased until, on June 15, 2021, all capacity restrictions in response to the COVID-19 pandemic were lifted.  Although the state has recently entered a fourth surge, in large part due to the Delta variant, no capacity restrictions have been reinstated.

### B. Procedural History

Plaintiffs filed the instant suit on May 27, 2020.  Doc. 1.  Plaintiffs assert that Defendants' enforcement of EEO 103—along with all subsequent amendments of the order[1]—violated their First Amendment rights to freedom of speech, freedom of assembly, and right to petition the government for redress of grievances; that EEO 103 is void for vagueness and therefore violates the due process clause of the Fourteenth Amendment; that they were falsely arrested in violation of the Fourth Amendment; that the Doe Defendants failed to intervene when they were falsely arrested; and that the City is liable for the aforementioned conduct pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

On June 1, 2020, Plaintiffs filed a motion for a temporary restraining order, seeking to enjoin the enforcement of EEO 103.  Doc. 8.  At a teleconference on June 4, 2020, the Court denied Plaintiffs' request.  Docs. 18 and 20.

On December 7, 2020, Defendants filed the instant motion.  Doc. 38.

---

[1] For ease of reference, the Court uses "EEO 103" to encapsulate any subsequent iterations of the order.

## II.    LEGAL STANDARD

### A. Federal Rule of Civil Procedure 12(b)(1)

Under Rule 12(b)(1), a party may move to dismiss a complaint for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  "Dismissal of a case for lack of subject matter jurisdiction under Rule 12(b)(1) is proper 'when the district court lacks the statutory or constitutional power to adjudicate it.'"  *Ford v. D.C. 37 Union Local 1549*, 579 F.3d 187, 188 (2d Cir. 2009) (per curiam) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  A lack of standing constitutes a jurisdictional defect and "may be addressed through a Rule 12(b)(1) motion."  *Lyons v. Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016).

In asserting a challenge pursuant to Rule 12(b)(1), a defendant may proffer evidence beyond the complaint and its exhibits.  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016).  In opposing such a motion, a plaintiff must put forward her own evidence to controvert the evidence presented by the defendant, or the plaintiff may instead rely on allegations in her pleading if the defendant's proffered evidence "is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing."  *Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d Cir. 2017) (quotation omitted).  "If a defendant supports [its] fact-based Rule 12(b)(1) motion with 'material and controverted' 'extrinsic evidence,' a 'district court will need to make findings of fact in aid of its decision as to subject matter jurisdiction.'"  *Nicholas v. Trump*, 433 F. Supp. 3d 581, 587 (S.D.N.Y. 2020) (quoting *Carter*, 822 F.3d at 57).

### B. Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). However, this "flexible plausibility standard" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (quotation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv,* 644 F.3d 122, 130 (2d Cir. 2011) (quotations omitted). Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). In considering a Rule 12(b)(6) motion, a district court may also consider "documents attached to the complaint as exhibits[] and documents incorporated by reference in the complaint." *Doe v. N.Y. Univ.*, No. 20 Civ. 1343 (GHW), 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)).

### C. Federal Rule of Civil Procedure 12(b)(7)

Under Rule 12(b)(7), an action must be dismissed for failure to join a party under Rule 19 if the absent party is (1) necessary but joinder is not feasible, and (2) indispensable to the action. *See Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth.*, 795 F.3d 351, 356–57 (2d Cir. 2015). In reviewing a Rule 12(b)(7) motion, a court may

accept all factual allegations in the complaint as true and draw inferences in favor of the plaintiff.  *Id.* at 354.  Further, a court can consider matters outside of the pleadings, such as affidavits, in deciding a Rule 12(b)(7) motion.  *EMR (USA Holdings), Inc. v. Goldberg*, No. 18 Civ. 7849 (ER), 2019 WL 5537878, at *4 (S.D.N.Y. Oct. 25, 2019).

## III.   DISCUSSION

### A. Standing

Defendants argue that Plaintiffs lack standing to assert their First Amendment claims, setting forth two arguments.  First, Defendants argue that Plaintiffs fail to establish causation—that is, that Plaintiffs' injury is fairly traceable to Defendants' conduct.  Regarding this point, Defendants emphasize that Plaintiffs do not challenge the State's Executive Order 202.10, which the Police Defendants could have independently relied on to arrest Plaintiffs.  Second, and relatedly, Defendants contend that Plaintiffs fail to establish redressability, noting that, even if the Court enjoins EEO 103, Executive Order 202.10 would still prohibit the same behavior.[2]

The Court concludes that Plaintiffs have standing to assert their First Amendment claims.  "The requirements of Article III standing are well established:  '[A] plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Lacewell v. Office of Comptroller of Currency*, 999 F.3d 130, 141 (2d Cir. 2021) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).  Regarding causation, Plaintiffs allege—and Defendants do not contest—that the Police Defendants arrested Plaintiffs pursuant to New York City Administrative Code § 3-108 for their violation of EEO 103.  So, even if the Police Defendants *could* have arrested Plaintiffs pursuant to Executive Order 202.10, Plaintiffs' alleged injury is still fairly traceable to Defendants' actions relating to the challenged conduct—*i.e.*, EEO 103.  Regarding redressability, Court notes

---

[2] The Court notes that neither party addresses the fact that outdoor capacity restrictions have been fully lifted since the commencement of the instant suit.

that, in addition to the requested prospective relief, Plaintiffs seek damages for their First Amendment claims.  Accordingly, the Court must consider the merits of Plaintiffs' claimed First Amendment violations.  *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021); *see also Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 608–09 (2001); *Amato v. Elicker*, No. 20 Civ. 464 (MPS), --- F. Supp. 3d ----, ----, 2021 WL 1430918, at *4 n.6 (D. Conn. Apr. 15, 2021).

### B. First Amendment Claims

#### 1. Standard of Review

Defendants argue that Plaintiffs fail to state a claim for a violation of their First Amendment rights to freedom of speech, freedom of assembly, and freedom to petition the government.

As an initial matter, the parties dispute the appropriate standard of review for Plaintiffs' claims.  Defendants contend that the deferential framework set forth in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), controls the Court's analysis.  In that case, the Supreme Court upheld a vaccination statute enacted by Massachusetts to protect against smallpox.  *Id.* at 38.  Under *Jacobson*, a state or local law "enacted to protect the public health" will survive judicial scrutiny unless it bears "no real or substantial relation to [the public health], or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law."  *Id.* at 31.  Although *Jacobson* "predated the modern constitutional jurisprudence of tiers of scrutiny," *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 635 (2d Cir. 2020), "it has been likened to rational basis review," *Jones v. Cuomo*, No. 20 Civ. 4898 (KPF), --- F. Supp. 3d ----, ----, 2021 WL 2269551, at *6 (S.D.N.Y. June 2, 2021).

By contrast, Plaintiffs contend that the Court must analyze their First Amendment claims under the tiers-of-scrutiny framework, relying on the U.S. Supreme Court's decision in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (per curiam), and the Second Circuit's decision on remand of that matter in *Agudath*.  In

*Roman Catholic Diocese*, the Supreme Court temporarily enjoined the enforcement of a New York executive order that placed restrictions on in-person religious services in an effort to combat the spread of COVID-19.  141 S. Ct. at 65–66.  To reach this conclusion, the Court undertook a traditional tiers-of-scrutiny analysis of the plaintiffs' First Amendment free exercise claims, concluding that strict scrutiny applied because the order targeted religious services.  *Id.* at 66–67.  Although concluding that "[s]temming the spread of COVID-19 is unquestionably a compelling interest," the Court held that the restrictions were not narrowly tailored and, therefore, did not pass constitutional muster. *Id.* at 67.  That opinion, it should be noted, does not reference *Jacobson* in its analysis. *See Jones*, --- F. Supp. 3d at ----, 2021 WL 2269551, at *6.  On remand, the Second Circuit converted the temporary injunction into a preliminary one, emphasizing that *Jacobson* "did not address the free exercise of religion" and therefore was not the appropriate legal framework for analyzing a free exercise claim.  *Agudath*, 983 F.3d at 635 (quotation omitted).

Although, after *Roman Catholic Diocese*, some courts in this Circuit have declined to apply the *Jacobson* framework to challenges brought pursuant to other provisions of the First Amendment, *see, e.g.*, *Amato*, --- F. Supp. 3d at ----, 2021 WL 1430918, at *7 & n.11, the majority of courts in this Circuit—along with several courts in other circuits—have limited *Roman Catholic Diocese* to First Amendment free exercise challenges, *see Jones*, --- F. Supp. 3d at ----, 2021 WL 2269551, at *7 (collecting cases in this and other circuits); *see also Hopkins Hawley LLC v. Cuomo*, No. 20 Civ. 10932 (PAC), --- F. Supp. 3d ----, ----, 2021 WL 465437, at *5 (S.D.N.Y. Feb. 9, 2021); *Our Wicked Lady LLC v. Cuomo*, No. 21 Civ. 165 (DLC), 2021 WL 915033, at *3 (S.D.N.Y. Mar. 9, 2021); *Weisshaus v. Cuomo*, 512 F. Supp. 3d 379, 396 (E.D.N.Y. 2021).  The Court agrees with the majority approach, and holds that *Jacobson* governs the analysis of the Plaintiffs' First Amendment claims here.

The analysis in *Hopkins*, upon which other courts in this District have relied, is instructive.  That court emphasized that, whatever doubts *Roman Catholic Diocese* and *Agudath* may raise about *Jacobson's* continuing viability, those cases dealt only with a free exercise claim, and did not explicitly overrule *Jacobson*.  *See Hopkins*, --- F. Supp. 3d at ----, 2021 WL 465437, at \*5; *see also Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other lines of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").  Further, the factual circumstances and legal claims in *Roman Catholic Diocese* and *Agudath* are distinguishable from the instant case.  In those cases, religious entities sought a preliminary injunction regarding the Governor's capacity limits on in-person worship services.  Here, by contrast, a completely different public health restriction is challenged—one that, as noted below, is content neutral—and the restriction does not implicate a free exercise claim.  *See Hopkins*, --- F. Supp. 3d at ----, 2021 WL 465437, at \*5.  And although decided over 100 years ago, *Jacobson* still "provides a workable framework that balances the delicate considerations at play"—*i.e.*, responding to the COVID-19 pandemic and maintaining constitutional liberties.  *Id.*  Accordingly, because the facts more directly align with those found in *Jacobson*, and neither the Supreme Court nor the Second Circuit has expressly addressed *Jacobson*'s viability as to other First Amendment claims, the Court is bound to apply *Jacobson* to Plaintiffs' claims here.

    *2. Jacobson*

    Applying *Jacobson*, the Court concludes that EEO 103 is constitutional.  As an initial matter, there is no question, and Plaintiffs do not dispute, that EEO 103 was enacted to protect the public health.  *Jacobson*, 197 U.S. at 31; *see also Geller v. de Blasio (Geller I)*, No. 20 Civ. 3566 (DLC), --- F. Supp. 3d ----, ----, 2020 WL 2520711, at \*3–4 (S.D.N.Y. May 18, 2020); *Geller v. Cuomo (Geller II)*, 476 F. Supp. 3d 1, 15

(S.D.N.Y. 2020).  As is well established, "courts—as well as much of the public—are in agreement that COVID-19 is a highly infectious and potentially deadly disease." *Jones*, --- F. Supp. 3d at ----, 2021 WL 2269551, at *8.  And as the court noted in *Geller I*, the City enacted EEO 103 "to slow the spread of a virus that ha[d at that time] hospitalized and killed tens of thousands of New Yorkers and infected hundreds of thousands more—in less than three months' time."  *Geller I*, --- F. Supp. 3d at ----, 2020 WL 2520711, at *4.

From there, Plaintiffs must show that EEO 103 bears no real or substantial relationship to the public health, or is a plain, palpable invasion of rights secured by fundamental law.  *Jacobson*, 197 U.S. at 31.  Plaintiffs fail to meet that burden.  Of course, since early May 2020, the scientific understanding of how the SARS-CoV-2 virus spreads has developed substantially.  Still, at the time that Plaintiffs were arrested, the "scientific and medical communities believe[d] that preventing in-person gatherings"—including outdoor ones—was "crucial to any strategy of containment," and courts in this District—including this one—agreed with that assessment, and the declining rates of infection following the enactment of EEO 103 validated that assessment at the time.  *See Geller I*, --- F. Supp. 3d at ----, 2020 WL 2520711, at *4; *see also Geller II*, 476 F. Supp. 3d at 15 (collecting cases in this and other circuits); Doc. 20.  Moreover, and as further discussed below, Plaintiffs maintained "ample alternative channels for the communication of [their] information," given that they were free to express their discontent online, through media, or by protesting individually.  *See Geller II*, 476 F. Supp. 3d at 16 (quoting *Geller I*, --- F. Supp. 3d at ----, 2020 WL 2520711, at *4).  Thus, EEO 103 was far from a plain, palpable invasion of rights secured by fundamental law.  Accordingly, the Court concludes—as other have before it—that EEO 103 survives review under *Jacobson*.  *Geller I*, --- F. Supp. 3d at ----, 2020 WL 2520711, at *5; *see also Geller II*, 476 F. Supp. 3d at 15–16.

    *3. Tiers of Scrutiny*

12

Even if *Jacboson* did not govern, Plaintiffs would still fail to state a claim under the tiers-of-scrutiny framework. *See Jones*, --- F. Supp. 3d at ----, 2021 WL 2269551, at *7 (analyzing claims under both *Jacobson* and tiers-of-scrutiny frameworks).

The First Amendment, as incorporated through the Fourteenth Amendment, prohibits a state from "abridging the freedom of speech[,] . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. am. I; *see also Johnson v. Perry*, 859 F.3d 156, 171 (2d Cir. 2017). "[T]he level of judicial scrutiny that must be applied to state actions inhibiting speech varies with the nature of the forum in which the speech occurs, and the same analytical framework applies whether the First Amendment right being exercised is speech . . . or other expressive activity such as assembly." *Johnson*, 859 F.3d at 171 (quotations omitted).

In a forum traditionally open to the public—such as a public street or park—"the government's authority to regulate speech or expressive conduct is typically 'sharply circumscribed.'" *Geller I*, --- F. Supp. 3d at ----, 2020 WL 2520711, at *3 (quoting *Hobbs v. County of Westchester*, 397 F.3d 133, 148 (2d Cir. 2005)). "A prior restraint on speech, *i.e.*, any regulation that gives public officials the power to deny use of a forum in advance of actual expression . . . bears a heavy presumption against its constitutional validity." *Id.* (quoting *Hobbs*, 397 F.3d at 148). A regulation restricting speech on the basis of content is analyzed under strict scrutiny review. *Hobbs*, 397 F.3d at 148–49. Under that standard, a content-based restriction may be upheld only if the restriction serves a compelling government interest, is necessary to serve the asserted compelling interest, is precisely tailored to serve that interest, and is the least restrictive means readily available for that purpose. *Id.* at 149. But when a regulation is content neutral, intermediate scrutiny applies. *Id.* Under that less stringent standard, the government may implement content-neutral regulations to "limit the time, place, or manner of expression—whether oral, written, or symbolized by conduct—even in a public forum, so long as the restrictions are 'reasonable,' are 'narrowly tailored to serve a significant

governmental interest,' and 'leave open ample alternative channels for communication of the information.'" *Id.* (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)); *see also Marcavage v. City of New York*, 689 F.3d 98, 104 (2d Cir. 2012); *Geller II*, 476 F. Supp. 3d at 18.  Under the intermediate scrutiny standard, "narrowly tailored" does not require a regulation to be the "least restrictive or least intrusive means."  *Marcavage*, 689 F.3d at 106 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989)); *see also Hobbs*, 397 F.3d at 149.  Rather, the "regulation is narrowly tailored 'so long as [it] . . . promotes a substantial government interest that would be achieved less effectively absent the regulation' and is 'not substantially broader than necessary.'"  *Marcavage*, 689 F.3d at 106 (quoting *Ward*, 491 U.S. at 799–800); *see also Hobbs*, 397 F. 3d at 149.

"The Supreme Court has held that 'the principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys.'"  *Lederman v. N.Y.C. Dep't of Parks & Recreation*, 731 F.3d 199, 202 (2d Cir. 2013) (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994)).  "A regulation is content neutral when it is 'justified without reference to the content of the regulated speech.'"  *Marcavage*, 689 F.3d at 104 (quoting *City of Renton v. Playtime Theatres*, 475 U.S. 41, 48 (1986)).  To that end, "a regulation is content-neutral if it 'serves purposes unrelated to the content of expression . . . even if it has an incidental effect on some speakers or messages but not others.'" *Geller I*, --- F. Supp. 3d at ----, 2020 WL 2520711, at *3 (quoting *Hobbs*, 397 F.3d at 150).  "Thus, a regulation that targets only potentially harmful secondary effects of speech, rather than the contents of the speech itself or the listener's agreement or disagreement with those contents, is deemed content-neutral."  *Hobbs*, 397 F.3d at 150. Notably, "[a] restriction designed to serve a governmental need to protect the security of the audience targets the speech's secondary, rather than its primary, effect.'"  *Geller I*, ---

F. Supp. 3d at ----, 2020 WL 2520711, at *3 (quoting *Hobbs*, 397 F.3d at 150); *see also Lederman*, 731 F.3d at 202.

The parties dispute whether strict scrutiny or immediate scrutiny applies. Plaintiffs argue that strict scrutiny governs the Court's analysis. Acknowledging that EEO 103, on its face, "makes no reference to particular content," Plaintiffs argue that Defendants failed to enforce it in a content- and viewpoint-neutral manner. Doc. 44 at 14. According to Plaintiffs, the discriminatory enforcement of EEO 103 was based solely on the content of the message of their protest—*i.e.*, that they were critical of the manner in which Defendants responded to the COVID-19 pandemic. As evidence of this alleged discrimination, Plaintiffs note that Defendants did not enforce EEO 103 against other individuals who were at the park—such as those standing around a nearby fountain or walking their dogs—while the protest occurred. *See* Doc. 1 ¶ 53. Additionally, although not alleged in the complaint, Plaintiffs assert that the discriminatory enforcement was even more blatant given the approach taken by Defendants against "significantly larger groups that participated in the various protests in the days following the tragic death of George Floyd," pointing to statements by the Mayor in response to the Black Lives Matter ("BLM") protests. Doc. 44 at 14–15. According to Plaintiffs, the only explanation for the alleged difference in enforcement of EEO 103 against the individuals protesting the murder of George Floyd and the Plaintiffs protesting Defendants' response to the pandemic, is that Defendants favored the former while abhorring the latter.

By contrast, Defendants contend that, if *Jacobson* does not govern, intermediate scrutiny applies. Defendants emphasize that EEO 103 bars individuals from congregating regardless of the content expressed at their gathering; thus, and as Plaintiffs acknowledge, EEO 103 is content neutral on its face. And as to the application of EEO 103, Defendants emphasize that Plaintiffs do not allege that, on the day of the arrest, the other park goers were engaged in prohibited non-essential gatherings. *See* Doc. 1 ¶ 53 (stating that "there were approximately ten *unassociated* members of the public nearby"

at any given time (emphasis added)).  As to Plaintiffs' assertion regarding Defendants'
response to the BLM protests, Defendants argue that those protests bore no similarity to
Plaintiffs' gathering, noting that the BLM protests involved "huge numbers of people"
and therefore, "from a law enforcement, public safety, or public health perspective,"
could not be handled "in the same manner in which" Plaintiffs' gathering was addressed.
Doc. 47 at 6.

As an initial matter, the Court notes that there are two ways to challenge a
regulation on First Amendment grounds:  facially and as applied.  *See Field Day, LLC v.
County of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006).  So, to determine the appropriate
level of scrutiny, it is necessary to distinguish between a facial and an as-applied First
Amendment challenge.  *Geller II*, 476 F. Supp. 3d at 13.  A facial challenge "considers
only the text of the statute [or regulation] itself, not its application to the particular
circumstances of an individual."  *Field Day*, 463 F.3d at 174.  By contrast, an as-applied
challenge "requires an analysis of the facts of a particular case to determine whether the
application of a statute [or regulation], even one constitutional on its face, deprived the
individual to whom it was applied of a protected right."  *Id.*  Although in their complaint
Plaintiffs allege that EEO 103 is "unconstitutional facially and as applied," Doc. 1 ¶ 80,
they concede that EEO 103 makes no reference to particular content, and do not
otherwise argue in their brief that the regulation facially violates the First Amendment.
Thus, the Court concludes that Plaintiffs have waived their facial challenge against EEO
103, *Cole v. Blackwell Fuller Music Publ'g, LLC*, No. 16 Civ. 7014 (VSB), 2018 WL
4680989, at *7 (S.D.N.Y. Sept. 28, 2018), and turns to determining the proper standard
for analyzing Plaintiffs' as-applied challenge.[3]

---

[3] Even if the facial challenge were not waived, the Court would conclude—as it and other courts in this
District have before—that intermediate scrutiny applies, and that EEO 103 would survive that review.  *See
Geller II*, 476 F. Supp. 3d at 13–16; *see also Geller I*, --- F. Supp. 3d at ----, 2020 WL 2520711, at *4–5.

The Court agrees that, if *Jacobson* does not control, intermediate scrutiny governs

its analysis.  Regarding the other park goers present during Plaintiffs' arrest, the Court

notes that there are no allegations that they were gathering together in violation of the ban

on non-essential gatherings—in fact, Plaintiffs allege that those park goers were

unassociated.  Nothing about EEO 103 prevented people from individually going to City

Hall Park, so the order could not be enforced against those other park goers.  Further,

even if the Court considered the unpleaded allegations regarding the BLM protests,

Plaintiffs fail to establish that Defendants favored the message of those protestors.  *See,*

*e.g.*, N.Y.C. Dep't of Investigation, *Investigation into NYPD Response to the George*

*Floyd Protests* 3 (2020),

https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20Geor

geFloyd%20Protests.12.18.2020.pdf (finding that the NYPD's use of force and certain

crowd control tactics to respond to the BLM protests "produced excessive enforcement

that contributed to heightened tensions").[4]  As this Court noted in *Geller II*, "[t]ens of

thousands engaged in street demonstrations in New York City on a near daily basis," and

the Mayor's statements in connection with the BLM protests "may reasonably be

construed as acquiescing to the inevitability of the protests, rather than actively

'encouraging' protests."  476 F. Supp. 3d at 14.[5]  Moreover, as the Court also emphasized,

"public officials need[ed] to have the flexibility to determine how to enforce the gathering

restrictions, [and] to determine the circumstance under which arrest may or may not be

appropriate."  *Id.* at 14.  Thus, and especially given the drastically different circumstances

surrounding Plaintiffs' arrest and the BLM protests, the Court is unpersuaded that

---

[4] "Agency determinations and administrative findings are public records of which a court may properly take judicial notice."  *Lia v. Saporito*, 909 F. Supp. 2d 149, 161 (E.D.N.Y. 2012).

[5] Although, in *Geller II*, the Court analyzed the plaintiff's allegations regarding the BLM protests with respect to her facial challenge of the State's analogous executive order, that analysis is still instructive here. Notably, the plaintiff argued that the executive order in that case "should be read as a content-based regulation because of the City's 'practice and policy' selectively suspending the First Amendment for some protests while 'encouraging' the BLM protests."  *Geller II*, 476 F. Supp. 3d at 13.

evidence regarding the latter supports a finding of content discrimination. *See id.* at 13. Accordingly, because Plaintiffs have not shown that the facts in the instant case show a content-based application of EEO 103, the Court must analyze Plaintiffs' as-applied challenge under intermediate scrutiny. *Field Day*, 463 F.3d at 174.

Defendants do not contest that stemming the spread of COVID-19 is unquestionably a substantial government interest—nor could they. *See Geller II*, 476 F. Supp. 3d at 15; *cf. Roman Catholic Diocese*, 141 S. Ct. at 67. Accordingly, the Court turns to whether EEO 103 is narrowly tailored to serve a significant government interest and leaves open ample alternative challenges for communication. *Lederman*, 731 F.3d at 202.

The Court concludes that EEO 103 satisfies this test. As the *Geller I* court noted regarding the same restriction:

> Given the severity of the public health crisis, the City has taken measures that are reasonable and narrowly tailored in temporarily prohibiting public gatherings. While a measure restricting all public group activity may not likely be found narrowly tailored in ordinary times, these times are extraordinary. The City has demonstrated that the scientific and medical communities believe that preventing in-person gatherings is crucial to any strategy of containment.

*Geller I*, --- F. Supp. 3d at ----, 2020 WL 2520711, at *4; *see also Geller II*, 476 F. Supp. 3d at 15–16. Moreover, "[t]hose conclusions have only been bolstered" since as conditions improved in the city and state "while other states that imposed less restrictive measures [saw] an alarming surge in infection rates and deaths, showing that any progress attained may be fragile." *Geller II*, 476 F. Supp. 3d at 16; *see also Geller I*, --- F. Supp. 3d at ----, 2020 WL 2520711, at *4 (noting that "the declining rates of infection and death among New Yorkers is evidence not that the gathering ban is overly broad, but rather that it is effective"). And although Plaintiffs allege that subsequent loosening of the gathering restrictions constitute "a tacit admission of guilt," Doc. 1 ¶ 41, the Court

concludes instead that the subsequent orders, tied to improving infection rates across the city and state, are evidence that EEO 103 was narrowly tailored, as the restriction was temporary.

The Court also concludes that EEO 103 afforded ample alternative channels for communication.  As this and other courts have noted, the plaintiffs were "free to express [their] discontent online, through media, and by protesting in public on [their] own." *Geller I*, --- F. Supp. 3d at ----, 2020 WL 2520711, at *4; *see also Geller II*, 476 F. Supp. 3d at 16.  And while it is true that "a single person protesting in public is not a perfect substitute for public group protests," these alternatives were certainly acceptable given their temporary nature.  *See Geller I*, --- F. Supp. 3d at ----, 2020 WL 2520711, at *4; *see also Geller II*, 476 F. Supp. 3d at 16.

Plaintiffs respond that, in *Roman Catholic Diocese*, the Supreme Court explicitly rejected the notion that virtual events could satisfy the "ample alternative channels for communication" portion of the intermediate scrutiny standard.  Plaintiffs point to the Supreme Court's statement in that case that, "while those who are shut out [by gathering limitations in houses of worship] may in some instances be able to watch services on television, such remote viewing is not the same as personal attendance.  Catholics who watch a Mass at home cannot receive communion, and there are important religious traditions in the Orthodox Jewish faith that require personal attendance." *Roman Catholic Diocese*, 141 S. Ct. at 68.

But again, *Roman Catholic Diocese* is inapposite, as it dealt with a free exercise claim and was analyzed under the strict scrutiny standard.  Moreover, the analysis referenced by Plaintiffs dealt not with whether remote viewings constituted ample alternative channels of communication; rather, that portion of the Supreme Court's analysis dealt with whether the denial of personal attendance for some religious traditions could constitute irreparable harm, for the purposes of a preliminary injunction.  *See id.* at 67–68.  Further, by Plaintiffs' logic, any statute or regulation barring in-person attendance

under any circumstances—where there are virtual alternatives—would be unconstitutional.  Such a holding would drastically restrict what survives under the "ample alternative channels for communication" portion of the intermediate scrutiny standard for First Amendment claims, and neither the Supreme Court in *Roman Catholic Diocese*—nor the Second Circuit in *Agudath*—so broadly held.  Thus, Plaintiffs' reliance on *Roman Catholic Diocese* is unavailing, and the Court concludes that they fail to state a claim for a violation of the First Amendment.

### D. Void for Vagueness Claim

The void-for-vagueness doctrine requires that a penal statute define a criminal offense (1) "with sufficient definiteness that ordinary people can understand what conduct is prohibited" and (2) "in a manner that does not encourage arbitrary and discriminatory enforcement."[6]  *United States v. Halloran*, 821 F.3d 321, 337 (2d Cir. 2016) (quoting *United States v. Rosen*, 716 F.3d 691, 699 (2d Cir. 2013)).  The touchstone of the first prong—the notice prong—"is whether the statute [or regulation], either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal," while "[t]he arbitrary enforcement prong requires that a statute give 'minimal guidelines' to law enforcement authorities."  *Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010) (first quoting *United States v. Lanier*, 520 U.S. 259, 267 (1997), and then quoting *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).  "Although a law must provide explicit standards, it need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth."  *Id.* (quotation omitted).

Plaintiffs argue that EEO 103 is void for vagueness because it does not define the term "non-essential gatherings," leaving members of the public with no guidance as to what conduct the order proscribes.  According to Plaintiffs, adding to the confusion is that a reasonable person might think that a protest falls within the definition of "essential,"

---

[6] Defendants do not contest that enforcement of EEO 103 has criminal implications, as the arrest was effectuated under New York City Administrative Code § 3-108 for violating the Mayor's executive order.

given the ordinary meaning of the word and the importance of the right to protest and assemble.  And while acknowledging that EEO 103 references and incorporates Executive Order 202.6, which defines an "essential business or entity providing essential services or functions," Doc. 1-6, Plaintiffs argue that individuals should not have "to resort to [canons] of statutory interpretation or Googling the State's website to determine the scope of their constitutional rights," Doc. 44 at 19.  Further, Plaintiffs contend that the lack of any definition for "non-essential gatherings" allowed Defendants to engage in a standardless sweep with the instant arrests, while not arresting the other park goers that day or individuals who attended the BLM protests.

Plaintiffs' arguments are unpersuasive.  By Plaintiffs' own admission, the very purpose of their gathering was to protest, among other pandemic-related responses, "the portion of the [emergency executive orders] that prohibit . . . 'non-essential' gatherings."[7] *See, e.g.*, Doc. 1 ¶¶ 43–46.  And as Plaintiffs also allege, prior to arresting Plaintiffs, Defendants played a recording for five minutes that explicitly warned Plaintiffs that they were engaging in a "non-essential gathering," and that they would be subject to arrest if they failed to disperse.  *Id.* ¶¶ 59–61.

In any event, EEO 103 satisfies both the notice and arbitrary enforcement prongs. Regarding the notice prong, as Plaintiffs acknowledge, EEO 103 incorporates the definition of "essential business or entity providing essential services or functions" in Executive Order 202.6, which provides an extensive list of what constitutes "essential." Contrary to Plaintiffs' assertion, a person of reasonable intelligence would know that anything not identified as "essential" was "non-essential."  Accordingly, because protests were not included within the meaning of "essential," a reasonable person would understand that the activity was "non-essential" and therefore proscribed by EEO 103. Similarly, the Court concludes that these definitions provide law enforcement authorities

---

[7] Plaintiffs' position here also seemingly contradicts their earlier position that Defendants discriminated against their protest *because* they were critical of the ban on non-essential gatherings.

with the minimal guidelines necessary to satisfy the arbitrary enforcement prong.  Thus, Plaintiffs' void-for-vagueness claims fail as a matter of law.

### E. False Arrest

The Court concludes that Plaintiffs' claims for false arrest are also meritless.  "[A] § 1983 claim for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizure, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006).  "To establish a § 1983 claim for false arrest, a plaintiff must show that '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" *Johnson v. City of New York*, No. 15 Civ. 6915 (ER), 2019 WL 294796, at *4 (S.D.N.Y. Jan. 23, 2019) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)).

However, "[p]robable cause is an absolute defense to a false arrest claim." *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (quoting *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 139 (2d Cir. 2010)).  "An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed . . . a crime." *Jaegly*, 439 F.3d at 152 (quotation omitted).  "A court 'must consider [only] those facts available to the officer at the time of the arrest and immediately before it.'" *Stansbury*, 721 F.3d at 89 (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)).  "A court examines each piece of evidence and considers its probative value, and then 'look[s] to the totality of the circumstances' to evaluate whether there was probable cause to arrest and prosecute the plaintiff." *Id.* (quoting *Panetta*, 460 F.3d at 395).

Again, Plaintiffs' protest was prohibited under EEO 103, and the Police Defendants arrested Plaintiffs for that violation.  Accordingly, the Court concludes that there was probable cause for Plaintiffs' arrest, barring their claims for false arrest.  *Id*.

### F.  Failure to Intervene

Plaintiffs also bring claims for failure to intervene, alleging that the Doe Defendants failed to intercede during Plaintiffs' arrest.  "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."  *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).  "To succeed on a failure-to-intervene claim in connection with a false arrest, the plaintiff is required to show that (1) the officer had reason to know that a citizen was being unjustifiably arrested, and (2) the officer had a realistic opportunity to intervene to prevent the arrest from occurring."  *Theodat v. City of New York*, 818 F. App'x 79, 82 (2d Cir. 2020) (summary order) (citing *Anderson*, 17 F.3d at 557).  Because here there was no underlying false arrest or other form of constitutional deprivation, Plaintiffs' failure-to-intervene claims must be dismissed.

### G.  Personal Involvement of the Mayor and Shea

Defendants assert that the Mayor and Shea should not be liable because they were not personally involved in Plaintiffs' arrest.  It is well settled that a defendant in a § 1983 suit may not be held liable for an award of damages to a plaintiff absent "personal involvement" in the conduct resulting in a constitutional violation.  *See Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016).  But here, Plaintiffs have failed to allege an underlying constitutional violation in which the Mayor and Shea can be alleged to be personally involved.

### G.  Municipal Liability

Similarly, Plaintiffs' claim against the City fails.  A municipality can be held liable under section 1983 only where it "'subjects' a person to a deprivation of rights or 'causes'

a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60

(2011) (quoting *Monell*, 436 U.S. at 691).  Because there was no underlying deprivation

of rights here, Plaintiffs' *Monell* claim fails.

Accordingly, the Court concludes that all of Plaintiffs' claims must be dismissed.[8]

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion is granted.  Because amendment

would be futile, Plaintiffs are denied leave to amend.  *See Attestor Value Master Fund v.

Republic of Argentina*, 940 F.3d 825, 833 (2d Cir. 2019); *421-A Tenants Ass'n, Inc. v. 126

Ct. St. LLC*, 760 F. App'x 44, 51 (2d Cir. 2019) (summary order).  The Clerk of Court is

respectfully directed to terminate the motion, Doc. 38, and close the case.


It is SO ORDERED.


Dated:     September 8, 2021
           New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.

---

[8] Because there was no constitutional violation, the Court need not determine whether qualified immunity applies.  *See Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (noting that a court may exercise pendent jurisdiction to determine whether a constitutional violation is alleged before it decides whether a defendant is shielded by qualified immunity).  Moreover, because the Court concludes that Plaintiffs' claims must be dismissed, it need not analyze Defendants' arguments pursuant to Rule 12(b)(7).